**FILED**

DEC 2 6 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00306-M-RN

| | |
|---|---|
| CHRISTIAN PROFFITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **PLAINTIFF'S MEMORANDUM OF LAW IN** |
| vs. ) | **SUPPORT OF PLAINTIFF'S MOTION FOR** |
| ) | **PARTIAL SUMMARY JUDGMENT** |
| NORTH CAROLINA DEPARTMENT OF ) | |
| PUBLIC SAFETY, ) | |
| ) | |
| Defendant ) | |

### INTRODUCTION

NOW COMES Plaintiff, Christian Proffitt, proceeding prose, to submit this

Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment.

### ARGUMENT

#### A.  FAILURE TO PROVIDE REASONABLE ACCOMMODATION UNDER THE ADA

An employer is liable for "failure to provide reasonable accommodation" under the Americans

with Disabilities Act of 1990 (ADA), as amended, when 1) they refuse to accommodate 2) an employee

who has a "disability" within the statutory meaning 3) despite knowing of their "disability" 4) when a

reasonable accommodation would permit said employee to perform the essential functions of the position.

*Perdue v. Sanofi-Aventis U.S.*, LLC, 999 F.3d 954, 959 (4th Cir. 2021).

#### 1.  Plaintiff has a Disability Under the ADA

The ADA defines "disability" as any "physical or mental impairment that substantially limits one

or more major life activities." 42 U.S.C. § 12102(1)-(2). Whether an impairment "substantially limits" an

individual's "major life activities" should be assessed broadly since the language of this statute is not

intended to be a demanding standard. *White v. City of Annapolis by & through City Council*, 439 F. Supp.

3d 522, 542–43 (D. Md. 2020). Plaintiff has suffered from Endometriosis (previously diagnosed as

1

Dysmenorrhea) since about 2011 and has been struggling with infertility since 2020. *See Exhibit C1; Exhibit D1; Exhibit A7; Exhibit E.*

Plaintiff has a record of disability pursuant to the ADA because she actively underwent fertility treatment from December 2020 until June 2022. *See Exhibit G; Exhibit E (p. 1-2)*. Moreover, Plaintiff underwent a laparoscopy in March of 2024 where the surgical findings confirmed that she did have Endometriosis, and that this disease led to her right fallopian tube adhering to her pelvic wall, among other abnormalities, due to years of scar tissue build up outside of her uterus. *See Exhibit M3; Exhibit N3 (p. 1)*. Finally, Plaintiff was diagnosed with Dysmenorrhea in September of 2021. *See Exhibit E (p. 2)*

Plaintiff's Endometriosis, when active, "substantially limits" her "major life activities" by causing excruciating levels of pain, heavy bleeding, fatigue, nausea (to include vomiting and diarrhea), all of which affects her ability to sleep, walk, stand, bend, and perform most manual tasks. *See Exhibit F (p. 1); Exhibit C1; Exhibit D1; Exhibit A7; Exhibit E*. This condition also completely inhibits the functionality of her reproductive system, which is recognized as a major bodily function under the ADA. § 12102(2)(B). These impairments have a profound and ongoing effect on Plaintiff's ability to perform activities that the average person in the general population can perform without limitation. *Wilson v. Dollar Gen. Corp.,* 122 F. Supp. 3d 460, 464 (W.D. Va. 2015).

Endometriosis' episodic nature does not undermine its applicability under the ADA because "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." § 12102(4)(D). Plaintiff's Endometriosis disables her on a monthly basis for at least the first day of her menstrual cycle. *See Exhibit A7; Exhibit D*. The fact that the condition is episodic does not take away its disabling effects on the days in which it is disabling.

Pregnancy-related impairments that affect the reproductive system are considered disabilities when they "substantially limit" "major life activities." *Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.,* 429 F. Supp. 3d 89, 104–05 (D. Md. 2019). Infertility is a pregnancy-related impairment of Plaintiff's reproductive system and impedes her ability to reproduce. Moreover, Endometriosis is the cause of this Infertility, which is pregnancy-related by extension.

2

An employee is also considered to have a "disability" under the ADA if they are regarded by their employer as having a qualifying "disability." § 12102(1)(C). Julie Fipps-Hernandez ("Fipps-Hernandez"), Plaintiff's direct supervisor at the time that these allegations arose, expressly believed that Plaintiff may be suffering from Endometriosis. When notified by Plaintiff of her disabling menstrual cycles, Fipps-Hernandez responded that Plaintiff "may be suffering from Endometriosis." *See Exhibit I (p. 1); Exhibit C7 (p. 128, lines 3-22).* This demonstrates that Fipps-Hernandez did, in fact, regard Plaintiff as having Endometriosis and understood that Plaintiff's condition was severe enough to warrant a potential diagnosis of Endometriosis. Fipps-Hernandez also stated that she was aware of Endometriosis and its severity. *See Exhibit C7 (p. 66, lines 13-25, p. 67, lines 1-12).*

The evidence reveals that no genuine issue of material fact exists as to whether Plaintiff's Endometriosis, Dysmenorrhea, and Infertility constitute disabilities under the ADA. Accordingly, the Court should rule as a matter of law that Plaintiff meets all three statutory definitions of "disabled" under § 12102(1)(A)-(C).

### 2. Defendant had Notice of Plaintiff's Disability

An employee must provide "notice" of their disability and their need for accommodation for the employer to be considered as having "knowledge" of the disability. *See Burnett v. BJ's Wholesale Club*, 722 F. Supp. 3d 566 (D. Md. 2024). This burden, however, is not a great one. *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011). Employees **are not** required to specifically refer to the ADA nor mention the words "accommodation request" to make an "adequate request" for accommodations under the ADA. *See* 42 U.S.C. § 12112(b)(5)(A); EEOC, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (Oct. 17, 2002); *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016).

Plaintiff notified Fipps-Hernandez of her disabilities for the first time in February of 2022, and in response to this notice, Fipps-Hernandez provided Plaintiff with Ibuprofen. *See Exhibit C7 (p. 73, lines 4-20); Exhibit Q7.* Plaintiff then notified Fipps-Hernandez of her disabling menstrual cycles again on April 29, 2022, and explicitly requested to telework on the first day of her menstrual cycle. *See Exhibit A7;*

3

*Exhibit C4.* Plaintiff also specifically stated that she was looking for a "medical accommodation" for the first day of her menstrual cycle due to a recent Gastritis diagnosis that now prevents her from taking pain medication. *See Exhibit N7 (RFA # 18); Exhibit C7 (p. 74, lines 17-25, p. 75, lines 1-20); Exhibit A7; Exhibit C4.*

Plaintiff then followed-up on this phone conversation on May 2 through an email to Fipps-Hernandez, explaining that she has an appointment with her OBGYN and required a schedule adjustment to attend it. *See Exhibit W1.* On May 10, Plaintiff sent another email informing Fipps-Hernandez that her doctor prescribed her new, stronger medication for her disability and stated that the doctor advised she could not take this medication while at work. *See Exhibit D7 (p. 2).* Plaintiff also explained that she is scheduled to start her menstrual cycle on Friday, May 20, is regular, and that she knows they will need to "figure something out" if she were to start during work hours. *Id.* Lastly, Plaintiff explained in this email that she is scheduled for a hysteroscopy, which is a surgery that is used to diagnose Endometriosis. *Id; Exhibit F (p. 2).*

On May 6, Plaintiff notified Fipps-Hernandez via phone call that she had been struggling with Infertility, was actively undergoing fertility treatment, and reminded her of her initial medical accommodation request from the phone call on April 29, 2022. *See Exhibit N7 (RFA # 29); Exhibit C7 (p. 77, lines 2-25, p. 78, line 1-5), (p. 81, lines 24-25, p. 82, line 1-25; p. 83, lines 1-25, p. 84, lines 1-3); Exhibit C4.* Finally, Plaintiff again notified both Fipps-Hernandez and Randy Jones ("Jones") (Plaintiff's then-Chief Court Counselor and Fipps-Hernandez's direct supervisor) that she required medical accommodations for her previously disclosed disabilities during the meeting she was called into on May 12. *See Exhibit C7 (p. 152, lines 12-25, p. 153, lines 1-12); Exhibit G7 (p. 56, lines 11-25, p. 57, lines 1-7); Exhibit C4; Exhibit P; Exhibit X; Exhibit R; Exhibit H7.* As such, Defendant had knowledge of Plaintiff's disabilities as well her need for workplace accommodations in relation to them.

Defendant has argued that Plaintiff did not submit an "adequate request" for accommodation because Plaintiff did not submit medical documentation along with her request, despite never having requested medical documentation from Plaintiff. *See Exhibit N7 (RFA # 50, #61); Exhibit I4 (p. 3);*

4

*Exhibit G7 (p. 81, lines 3-14)*. However, an employer cannot contest the adequacy of an employee's notice based on their failure to submit medical records when the employer never requested them. *Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 104–05 (D. Md. 2019). An employer need only be aware of the facts indicating a disability, not be provided with formal medical documentation *unless* they specifically requested such documentation. *Id.* 429 F. Supp. 3d 89 at 105.

Defendant admits to never requesting medical documentation from Plaintiff while also admitting that they were aware Plaintiff suffered from "heavy menstrual cycles" – that of which were severe enough to require a workplace accommodation. *See Exhibit I4 (p. 1-3); Exhibit G7 (p. 81, lines 3-14), (p. 56, lines 11-24, p. 57, lines 1-7); Exhibit C7 (p. 128, lines 3-22); Exhibit J7; Exhibit C4; Exhibit I (p. 1)*. Therefore, Defendant cannot contend that they did not have "adequate notice" of Plaintiff's disability on the grounds that Plaintiff did not submit medical documentation they never requested.

Similar to the ADA, Defendant's own policy does not require a formal request from an employee for it to constitute a valid accommodation request, nor does it require the request to be in writing. NCDPS is a state agency under the authority of the North Carolina Office of State Human Resources (OSHR). According to OSHR's ADA policy, employees **are not** required to formally request medical accommodations under the ADA in writing, as a verbal request to their direct supervisor is sufficient. *See Exhibit L (p. 10)*. Plaintiff initially made a verbal request for accommodation, triggering Defendant's duty to engage in the interactive process under federal law, and then followed-up on this request via email to Fipps-Hernandez. *See Exhibit N7 (RFA # 18); Exhibit A7; Exhibit D7 (p. 2)*. Even if Defendant argues that the follow-up email lacked specificity, Plaintiff's repeated verbal requests in combination with her follow-up emails provided sufficient notice to meet the standard for an "adequate request" under the ADA. Jones and Fipps-Hernandez were able to articulate exactly what Plaintiff requested and the reason she requested it; demonstrating that they did, in fact, have adequate notice.

While NCDPS's internal ADA policy appears stricter than OSHR's and requires written requests, Plaintiff's follow-up email sent to Fipps-Hernandez on May 10 satisfied this requirement by explicitly

5

notifying the supervisor of a serious medical condition, requesting specific workplace adjustments (such as flex and leave time), and referencing the impact of treatment and medication on Plaintiff's work. *See Exhibit D7 (p. 2)*. As such, Plaintiff requested cooperation from Defendant in conjunction with her stated need to attend medical appointments and undergo scheduled and prescribed treatment. This notice constitutes an adequate notice for a medical accommodation under the ADA. *See Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188-89 (10th Cir. 2016).

Accordingly, the evidence demonstrates that Plaintiff's request for accommodation was adequate, and the Court should rule as a matter of law that Defendant had knowledge of Plaintiff's disabilities and that she validly requested a medical accommodation under the ADA for these disabilities.

## 3. Defendant Refused to Accommodate

Once an employer is notified of an employee's disability and their need for accommodation in relation to that disability, the employer has a duty to make a reasonable effort to determine an appropriate accommodation. *See* § 12112(b)(5)(A). *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 735 (D. Md. 1996). In engaging in the interactive process, employers are expected to 1) evaluate the specific job and determine its purpose and the tasks that are essential to it, 2) consult with the employee to understand how their disability affects their ability to do the job and discuss ways a reasonable accommodation would assist, 3) explore possible accommodations with the employee and evaluate how effective each option would be in helping them to carry out the essential functions of their job, and 4) consider the specific form of accommodation requested by the employee and ultimately choosing an accommodation that works best for both the employee and employer. *Bryant*, 923 F. Supp. at 735 (1996).

Moreover, a response from the employer to an employee's accommodation request that lacks genuine engagement or demonstrates a failure to identify reasonable accommodation may constitute a breach in their duty to engage in the interactive process required under the ADA. *Brown v. Martin Marietta Materials, Inc.*, 440 F. Supp. 3d 503, 517 (M.D.N.C. 2020). Failure to engage meaningfully may be actionable if it obstructs the identification of an accommodation that would allow the employee

6

to perform essential job functions. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061–62 (7th Cir. 2014).

Plaintiff expressed her need for medical accommodations several times through various mediums between April 29, 2022, and May 12, 2022 – to include via phone call, email, and face-to-face conversation. *See Exhibit A7; Exhibit C4; Exhibit W1; Exhibit C7 (p. 77, lines 2-25, p. 78, line 1-5), (p. 81, lines 24-25, p. 82, line 1-25; p. 83, lines 1-25, p. 84, lines 1-3); Exhibit D7 (p. 2); Exhibit P; Exhibit R; Exhibit N.* At no point did Defendant respond by assisting Plaintiff with securing medical accommodations, nor did they explore potential medical accommodations with her. *See Exhibit G7 (p. 73, lines 8-25, p. 74, lines 1-3; p. 75, lines 12-25, p. 76, lines 1-4); Exhibit C7 (p. 93, lines 13-24), (p. 171, lines 9-15), (p. 167, lines 22-25, p. 168, lines 1-2); Exhibit I4 (p. 2-3); Exhibit N7 (RFA # 61, #69, #70, #74, #75).* Instead, Defendant repeatedly ignored Plaintiff's emails outlining her disabilities, upcoming treatment, and need for a modified work schedule, and then finally outright denied Plaintiff's medical accommodation request without ever formally considering it, documenting it, or sending it up the proper chain as stipulated by NCDPS' and OSHR's ADA policy. *See Exhibit I4 (p. 2-3); Exhibit C7 (p. 171, lines 9-15).*

Defendant failed at every step of the 4-step interactive process outlined in *Bryant*. Instead, Jones and Fipps-Hernandez pulled Plaintiff into a meeting on May 12 and expressly informed her that there would not be any medical accommodations provided to her. *See Exhibit P; Exhibit X; Exhibit R.* An employer may not simply reject an employee's request for medical accommodation without expressing a willingness to continue discussing possible accommodations. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). Defendant, however, did exactly this. They sharply and wholly rejected Plaintiff's medical accommodation request without any showing of a willingness to discuss possible accommodations. This demonstrates Defendant's active and intentional failure to engage in the interactive process as required under the ADA and Defendant's own ADA policies.

Jones later argued that Plaintiff "should have known" how to secure accommodations without managerial assistance since "she received the highest grade in her basic training class", implying that

7

Plaintiff's intellectual abilities should have made her capable of overcoming their refusal to assist her. *See Exhibit O4.* But an employer cannot avoid liability for failing to engage in the interactive process by asserting that the employee could have been more assertive when the employer showed no willingness to engage in the interactive process. *Id.* Defendant was intentionally uncooperative at every stage of Plaintiff's request through more than one supervisor.

Immediately after the May 12 meeting, Plaintiff contacted NCDPS' Human Resources ("HR") department. *See Exhibit P; Exhibit R; Exhibit N.* Although Plaintiff explained that the crux of her issue was the fact that her direct supervisors outright denied her medical accommodation request, HR offered no assistance in helping her seek medical accommodations but suggested she file an external EEOC complaint. *See Exhibit P; Exhibit R.* As such, Defendant failed their legal duty of providing reasonable accommodation to Plaintiff by taking no action other than rejecting Plaintiff's request or suggesting she file an external EEOC complaint. *See Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).

Defendant admits that they did not send Plaintiff's medical accommodation request up the proper channels for official consideration. *See Exhibit I4 (p. 2-3); Exhibit G7 (p. 73, lines 8-25, p. 74, lines 1-3; p. 75, lines 12-25, p. 76, lines 1-4); Exhibit C7 (*p. 171, lines 9-15); *Exhibit N7 (RFA # 59, #70).* They also admit that they were aware that this was the proper process, but still did not do so. *See Exhibit I4 (p. 2-3).* Finally, Defendant admits that they told Plaintiff she would not be accommodated during the May 12 meeting, and that they did not refer Plaintiff to any ADA policy, ADA representative, HR representative, or any other person or thing that would have assisted Plaintiff with securing accommodations, nor did they consult with any of these people or things themselves in response to Plaintiff's medical accommodation request. *See Exhibit G7 (p. 73, lines 8-25, p. 74, lines 1-3; p. 75, lines 12-25, p. 76, lines 1-4); Exhibit C7 (p. 93, lines 13-24), (p. 171, lines 9-15); I4 (p. 2-3).* These matters are uncontested; therefore, the Court should rule as a matter of law that Defendant refused and failed to provide reasonable accommodation for Plaintiff by failing to engage in the interactive process as required by the ADA, which led to their failure to identify a reasonable accommodation for Plaintiff's known disabilities.

8

**4. Accommodation was Available and Permits Performance of Essential Job Functions**

A plaintiff's success or failure on the "essential job functions" element turns on just what the essential functions of their position are. *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024). Plaintiff served as a Juvenile Court Counselor Trainee ("JCCT") who performed the duties of an Intake Court Counselor. *See Exhibit M7; Exhibit K1*. Defendant admits that this is an office-based position that has supported telework capabilities in the past. *See Exhibit C7 (p. 18, lines 17-25, p. 19, lines 1-8); Exhibit L7 (p. 15, lines 14-23)*. Plaintiff's primary duties included 1) receiving and processing juvenile complaints, 2) holding intake conferences, 3) drafting and sending out letters to various parties, and 4) making decisions on juvenile complaints. *See Exhibit C7 (p. 13, lines 17-25, p. 14, lines 1-9)*.

Defendant has not identified any other "essential job function[]" that Plaintiff was responsible for carrying out in her position that would have been threatened by her teleworking one day a month. As such, Plaintiff's request to telework once a month was reasonable, consistent with the essential functions of her job, and would have enabled her to perform those functions effectively. Furthermore, the ability to telework is explicitly listed in Defendant's ADA policy as an available accommodation for NCDPS employees. *See Exhibit M.* Plaintiff's request to telework once a month on the day of her menstrual cycle was an available accommodation at NCDPS for her position.

This accommodation would have allowed Plaintiff to work from a more comfortable position, such as lying down to relieve pressure on her pelvis and abdomen and would have allowed her to manage other external factors such as the temperature in her work environment since cold air worsens the symptoms of Plaintiff's Endometriosis. Additionally, teleworking would have provided Plaintiff with privacy to manage severe symptoms such as crying, nausea, vomiting, or fatigue due to pain, preventing these vulnerable moments from being witnessed or misunderstood in a professional setting. Plaintiff would also have quick and constant access to a clean and private bathroom for when she would eventually vomit and experience diarrhea from the pain and constant pelvic and abdominal contractions.

9

Teleworking also eliminates Plaintiff's need to commute into the office during while experiencing severe pain, which would have conserved Plaintiff's energy and allowed her to start her day with greater focus and productivity. Finally, this accommodation would have also reduced distractions for Plaintiff, her coworkers, and the Department's clients by allowing her to manage her severe and unpredictable symptoms in a private, controlled environment. This accommodation would have proven to be a mutually beneficial arrangement if not for Defendant unlawfully actively and pervasively barring Plaintiff's access to it.

The evidence in the record establishes these conclusions to be true. Therefore, the Court should rule as a matter of law that Defendant failed to provide a reasonable accommodation to Plaintiff, despite one being available, by failing to engage in the interactive process required under the ADA.

## B.   DISABILITY DISCRIMINATION UNDER THE ADA

To establish a claim for "disability discrimination" under the ADA, Plaintiff must show that 1) she has a "disability", 2) she was a "qualified individual" for the employment in question, and 3) her employer took "adverse action" against her because of her "disability". *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015).

### 1.   Plaintiff has a Disability Under the ADA

The discussion of Plaintiff's medica conditions and how they meet the statutory definitions of disability under the ADA has been set forth in Section A.1 of this document. That discussion is incorporated by reference here.

### 2.   Plaintiff was a Qualified Individual for the Employment in Question

An employee is "qualified" if they can perform the essential functions of the employment position they hold with or without reasonable accommodation. *Wirtes v. City of Newport News*, 996 F.3d 234, 238 (4th Cir. 2021); *Smith v. CSRA*, 12 F.4th 396, 412 (4th Cir. 2021). Plaintiff was "qualified" for the position she was assigned during the relevant time period. The facts from section A.4 of this document demonstrate that she would have been able to perform her essential functions of Intake Court Counselor while teleworking once a month when her Endometriosis disabled her (with a reasonable

10

accommodation). These facts are incorporated here by reference. Additionally, Plaintiff was "qualified" for the position when her Endometriosis was not active, as evidenced by her initial hiring records and her satisfactory performance on the job. *See Exhibit O7; Exhibit M7 (p. 3); Exhibit P7*. Therefore, the Court should rule as a matter of law that Plaintiff was a "qualified" individual for the employment in question.

### 3. Defendant Took Adverse Action Against Plaintiff Due to Her Disability

An adverse employment action is a significant change in employment status, such as failing to promote, or a decision that causes a significant change in benefits. *Hoyle v. Freightliner*, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Additionally, actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" may also constitute adverse employment actions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)

Plaintiff served as a JCCT in Defendant's two-year training program. This training progression should have automatically turned into a permanent position of Juvenile Court Counselor ("JCC") upon its completion. However, during the meeting on May 12, 2022, Jones explicitly informed Plaintiff that she **would not** be promoted to JCC and, as such, would not be kept as an employee at the conclusion of her training progression. *See Exhibit C7 (p. 153, lines 6-12); Exhibit G7 (p. 63, lines 5-25); Exhibit J7; Exhibit H7.* Jones' statement was the functional equivalent of a termination, as well as an actual failure to promote, which is explicitly recognized as an adverse employment action. *Hoyle*, 650 F.3d at 337.

Defendant's decision not to retain Plaintiff past the training progression was directly tied to her request for medical accommodation. This is evidenced by the temporal proximity between Plaintiff's accommodation request and the decision to deny her promotion since both Plaintiff's medical accommodation request as well as the decision not to keep Plaintiff past the trainee progression were discussed during the same meeting. *Id.* In fact, Jones admitted to discussing Plaintiff's termination with his supervisor due to Plaintiff's sick leave usage and medical accommodation request. *See Exhibit J7; Exhibit G7 (p. 68, lines 12-25, p. 69, lines 1-25).* Moreover, Defendant has failed to identify any legitimate, non-discriminatory reason for these discussions and their decision not to keep Plaintiff on as

11

a JCC. During his deposition, Jones was unable to articulate any performance or behavioral deficiencies to justify these discussions and admitted to never having discussed not promoting any other JCCT prior to discussing it in reference to Plaintiff. *See Exhibit G7 (p. 68, lines 12-25, p. 69, lines 1-25).* This lack of justification and the unprecedented action of refusing to allow a JCCT to be promoted to JCC demonstrates an adverse employment action on the part of Defendant against Plaintiff.

Additionally, Jones informed Plaintiff that if they were to ever have another meeting about **any** of the things discussed during the May 12 meeting, she would be immediately subjected to disciplinary action, "to include termination." *See Exhibit H7; Exhibit C7 (p. 163, lines 12-24).* Although the 4th Circuit has held that a threat alone does not constitute an adverse employment action, the threat of immediate termination, when combined with the express statement from Jones that the decision was already made to not keep her past the 2-year training progression, contributes to a hostile work environment and establishes materially adverse conduct. *Hoyle*, 650 F.3d at 337; *Burlington Northern*, 548 U.S. at 68. In considering the totality of the circumstances, Defendant's conduct demonstrates a pattern of adverse employment actions that occurred only after Plaintiff's accommodation request. Defendant has offered no other legitimate explanation for this conduct.

Moreover, the threat of immediate termination in the same meeting where Plaintiff's medical accommodation request was discussed would have deterred any reasonable employee from continuing to assert their rights under the ADA, as well as would have led them to believe that they must choose between managing their disability and their job; leading to a work environment so untenable to justify a constructive discharge. *See, Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008). Both of these actions demonstrate significant changes in Plaintiff's employment status and, as such, constitute adverse employment actions under the ADA. The temporal proximity between Plaintiff's requests for accommodations and Defendant's actions, coupled with the lack of any legitimate justification, demonstrates that these actions were taken due to Plaintiff's disabilities and her attempts to secure accommodations for them.

12

Furthermore, an employer's refusal to provide reasonable medical accommodations can, in and of itself, constitute an adverse employment action. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015). A refusal to accommodate deprives the employee of necessary support to perform essential job functions, which, naturally, significantly and directly impacts the conditions of their employment. Here, Defendant categorically refused to consider and provide Plaintiff with any medical accommodations.

The fact that Fipps-Hernandez and Jones underwent a comprehensive ADA training just days before Plaintiff's initial medical accommodation request precludes any argument Defendant may try to raise that they were ignorant of their duties under the ADA. Specifically, Fipps-Hernandez underwent NCDPS' ADA training on April 12, 2022, seventeen days prior to Plaintiff's April 29 request. *See Exhibit R7.* Jones underwent this training on May 10, 2022, eleven days prior to Plaintiff's April 29 request, and 2 days before the May 12 meeting where he blatantly denied Plaintiff's medical accommodation request. *See Exhibit S7.* This ADA training explicitly states that 1) the interactive process is required and that 2) every ADA accommodation is to be determined individually. *See Exhibit N4 (p. 7, p. 9).*

Defendant has admitted that 1) Plaintiff requested to telework on the first day of her menstrual cycle due to its debilitating nature and that 2) Defendant denied this request without exploring any alternative accommodations or without forwarding the request through the proper channels for official consideration, as stipulated by their own policy. Therefore, the Court should rule as a matter of law that Defendant took adverse employment action against Plaintiff due to her disability by 1) threatening to terminate her after and within the same meeting where her medical accommodation request was discussed, 2) expressly deciding that she would not be promoted from trainee to the permanent position of JCC after and in the same meeting where her medical accommodation request was discussed, and 3) outright denying her medical accommodation request without engaging in the interactive process required under the ADA.

## C.  RETALIATION UNDER THE ADA

13

To establish a claim of "retaliation" under the ADA, Plaintiff must show that 1) she engaged in "protected activity" and 2) because of this, 3) Defendant took an adverse employment action against her. *Jordan v. Sch. Bd. of City of Norfolk*, 640 F. Supp. 3d 431, 445 (E.D. Va. 2022). "Protected activity" under the ADA includes submitting a request for medical accommodation. *Id*. To show that there has been a retaliatory action in response to Plaintiff's "protected activity", the Plaintiff must demonstrate that the action "might have dissuaded a reasonable worked from making or supporting a charge of discrimination." *Id*.

The facts outlined in section B.3 of this documented are incorporated here by reference. These facts show that Plaintiff engaged in "protected activity" by requesting to telework on the first day of her menstrual cycle. In response to this, Plaintiff was pulled into a meeting by Defendant and informed that she would not be receiving this medical accommodation, or any medical accommodation, that she would not be promoted to JCC, and that she would be terminated at any further attempt to discuss this matter. The Defendant's actions per these facts constitute an adverse employment action against Plaintiff based on her medical accommodation request. As such, Defendant retaliated against Plaintiff under the meaning of the ADA. Accordingly, the Court should rule as a matter of law that Defendant retaliated against Plaintiff.

## D. CONSTRUCTIVE DISCHARGED UNDER THE ADA

To establish a claim of "constructive discharge" under the ADA, Plaintiff must show that 1) she is within the ADA's protected class, 2) that she was "discharged" and at the time of her discharge, was performing the job at a level that met Defendant's legitimate expectations, and 3) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Gallimore v. Newman Mach. Co.*, 301 F. Supp. 2d 431, 441 (M.D.N.C. 2004).

A constructive discharge can also occur when the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *Leckie v. Bd. of Edu. of Montgomery Cnty.*, No. CV TDC-23-0299, 2023 WL 8809210, a *5 (D. Md. Dec. 19, 2023); *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002); *see Burks v. Okla. Publ'g*

14

*Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (finding that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired).

### 1. Plaintiff Falls within ADA's Protected Class

As outlined in section A.1 above, Plaintiff's medical conditions constitute a "disability" under the meaning of the ADA and, as such, she falls within ADA's protected class. The facts of that section are incorporated here by reference.

### 2. Plaintiff was Discharged While Satisfactorily Performing Duties

This claim arises under the same facts outlined in section B.3 of this document. Those facts are incorporated here by reference. Plaintiff was "discharged" by Defendant through their actions of repeatedly ignoring, and eventually denying, Plaintiff's medical accommodation request without ever considering it, informing Plaintiff that she will not remain employed at the end of her training progression, and informing Plaintiff that she would immediately be terminated if they were to ever have a discussion regarding Plaintiff's medical accommodation request again.

These facts support the conclusion that these actions led to Plaintiff's "constructive discharge" because on the same day that Plaintiff was told the above, she put in her resignation. *See Exhibit E7.* Prior to her last working day, Plaintiff communicated to at least three other higher-level supervisors that the only reason she resigned was because of the events that transpired that led to the filing of Plaintiff's complaints in this action. *See Exhibit P; Exhibit R; Exhibit I7.* Moreover, Defendant admits that Plaintiff performed her job duties satisfactorily. *See Exhibit P7.*

### 3. Discharge Stemmed from Unlawful Discrimination

Courts should assess the totality of the circumstances in determining whether an employee's resignation was voluntary. *Bodkin v. Town of Strasburg, Virginia*, 386 F.App'x 411, 413 (4th Cir. 2010). Defendant's actions leading to Plaintiff's discharge are consistent with circumstances that raise a reasonable inference of unlawful discrimination because 1) Defendant admits discussing her termination her without a legitimate reason for doing so and never having done so for any other similarly situated

15

employee, 2) despite admitting that she was performing satisfactorily and at a level that met their legitimate expectations.

Moreover, in her resignation letter, Plaintiff provided only 1 weeks' notice, despite common practice being 2 weeks. In doing so, she established her last working day as May 19 – the very day before her next menstrual cycle. *See Exhibit E7; Exhibit D7 (p. 2, line 13)*. This shortened notice demonstrates the urgency and compelling nature accompanied by Plaintiff's resignation. The intentional timing of Plaintiff's resignation demonstrates that she intended to remain on the job as long as possible while still giving herself an opportunity to manage her disabilities without further interference from Defendant. Furthermore, Plaintiff resigned despite not having another job lined up, further demonstrating the compelling nature of the resignation based on Defendant's unlawful conduct. *Contra Ellison v. Inova Health Care Servs.*, 730 F. Supp. 3d 221, 232–33 (E.D. Va. 2024) (finding that an employer's communication to a reasonable employee that they will be terminated to support a claim of constructive discharge is mitigated by the former employee obtaining new employment prior to their resignation).

### 4. Deliberateness Obsolete

Under Green's objective standard for constructive discharge, whether the employer refused to accommodate an employee in "an effort to force them to quit," is no longer relevant. *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017). This means that Plaintiff is not required to show that Defendant acted in a manner to deliberately force Plaintiff to quit. Nevertheless, a "complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Cathey v. Wake Forest Univ. Baptist Med. Ctr.*, 90 F. Supp. 3d 493, 508 (M.D.N.C. 2015) (quoting *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir.1993)).

Plaintiff notified Defendant of her disabilities and her need for accommodations repeatedly; specifically, in February of 2022, April 29, May 2, May 4, May 6, May 10, and May 12. Yet, Defendant completely failed to even attempt to accommodate Plaintiff in the face of each of these notices. Moreover, Defendant admits that they informed Plaintiff that her employment would not be retained at the end of her

16

two-year training progression. These facts support Plaintiff's contention that she was discriminated against for the purposes of making her resign.

Defendant may argue that Plaintiff was not constructively discharged because she was expected to remain on the job while seeking redress. However, Plaintiff's working conditions exceeded ordinary discrimination, which necessarily undermines this argument under *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). Plaintiff's request for accommodation and the disclosure of her disabling medical conditions were ignored several times before being blatantly denied. Plaintiff was also threatened with termination should she raise the issue again and was informed that she would not be retained at the completion of her training progression. When Plaintiff contacted HR after the meeting to address her denial and the threats she had received, she was told that her only option was to file an external EEOC complaint, rather than being offered any internal support or assurance that her medical accommodation request would be considered. When Plaintiff sought to rescind her resignation and transfer to another district, the Director of Court Services ignored her request, and the Central Area Administrator denied it. Plaintiff had no reason to believe that remaining employed would lead to a resolution, particularly given her employer's repeated refusals to engage in the interactive process required under the ADA.

Moreover, Plaintiff's resignation was not impulsive or unreasonable but was carefully timed to coincide with her next menstrual cycle. Plaintiff had already informed her supervisor that her period was scheduled to begin the following week. Given Defendant's clear refusal to provide the requested telework or consider alternative accommodations, Plaintiff had no viable option but to resign in order to manage her medical condition effectively. Defendant's actions, alongside the impending onset of Plaintiff's Endometriosis, left her with no reasonable alternative but to resign.

Defendant's clear refusal to engage in the ADA interactive process led Plaintiff to believe that she must choose between her job and her health. *Exhibit P; Exhibit R.* This implicit ultimatum is consistent with a finding that any reasonable person would have felt compelled to resign, on top of the fact that Plaintiff was already informed that she was functionally terminated. Therefore, the evidence shows that each element of "constructive discharge" is met, to include the "deliberateness" element.

17

Accordingly, the Court should rule as a matter of law that Plaintiff was constructively discharged by the Defendant.

**E. Hostile Work Environment Under the ADA**

To establish a "hostile work environment" claim under the ADA, Plaintiff must show that 1) she is a qualified individual with a disability, 2) she was subjected to unwelcome harassment, 3) that the harassment was based on her disability, 4) that the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment, and 5) some factual basis exists to impute liability for the harassment to the employer." *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 367 (4th Cir. 2022).

**1. Plaintiff is a Qualified Individual with a Disability**

As outlined in section A.1 of this document, Plaintiff's medical conditions constitute a "disability" under the meaning of the ADA. Additionally, Plaintiff was a qualified employee for the position she held as established in section B.2 of this document. The facts of these sections are incorporated here by reference.

**2. Plaintiff was Subjected to Unwelcome Harassment**

Harassment can be shown to be "unwelcome" where the employee 1) complains of it to superiors, whether verbally or in writing, 2) requests to be reassigned out of the environment, and 3) where they explicitly regard it as such. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008). Plaintiff immediately called the HR department to complain of the events that transpired during the May 12 meeting. *See Exhibit P; Exhibit R; Exhibit N.* Additionally, Plaintiff sent emails to HR personnel, and the Director of Court Services to report these same concerns. *See Exhibit P; Exhibit R.* In these emails, Plaintiff also requested to be transferred out of the district and into another district to escape the hostile work environment. *See Exhibit R; Exhibit I7.* Finally, Plaintiff documented her perceptions of the unwelcomes actions where she explicitly states that she is "in desperate need of help" and feels as if she has been "cornered" and "unfairly reprimanded." *See Exhibit H7.* These facts demonstrate that the Defendant's conduct towards Plaintiff was "unwelcome."

**3. Harassment was Based on Plaintiff's Disability**

18

The harassing May 6, 2022 phone call detailed in E.4 of this section was in direct response to Plaintiff's recent request to use sick leave for a prior OBGYN appointment. Moreover, in her deposition, Fipps-Hernandez testified that she informed Jones of Plaintiff's medical accommodation request just before the May 12 meeting. *See Exhibit C7 (p. 92, lines 9-25, p. 93, lines 1-12)*. In response to this disclosure, Jones instructed her to summon Plaintiff for a meeting. *Id.* These facts establish that both the harassing May 6 phone call and the harassing May 12 meeting was in direct response to Plaintiff's disabilities and her consistent effort to realize her employment rights in managing them.

## 4. Harassment Sufficiently Severe to Alter Employment

"[A]n isolated incident of harassment, if extremely serious," can suffice to create a hostile work environment. *Jessup,* 23 F.4th at 367. On May 12, 2022, Plaintiff was summoned into a meeting with Jones and Fipps-Hernandez. *See Exhibit C7 (p. 92, lines 9-25, p. 93, lines 1-12)*. In this meeting, Plaintiff was informed that there would 'absolutely not' be any accommodations for her disabilities. *See Exhibit P; Exhibit X; Exhibit R.* When Plaintiff attempted to explain that she has medical conditions that require the requested medical accommodation, and that she is undergoing treatment via doctor's appointments for these conditions, Jones stated, "we all have medical illnesses; we all have medical appointments," thus, dismissing Plaintiff's disclosed disabilities. *See Exhibit P; Exhibit X; Exhibit R; Exhibit H7.* Jones then expressly stated that Plaintiff would not be promoted to JCC at the end of her training progression, and explicitly threatened Plaintiff with immediate termination should they have to discuss her need for accommodations again. *See Exhibit C7 (p. 153, lines 6-12); Exhibit J7; and Exhibit H7.*

Nevertheless, this was not the only instance where Defendant subjected Plaintiff to a hostile work environment. In fact, this May 12 meeting directly resulted from the phone call that took place on May 6 between Plaintiff and Fipps-Hernandez referenced in E.2 of this section. This phone call was the result of Plaintiff requesting to use sick leave to make up for an OBYN appointment that took place earlier that week; an appointment Plaintiff had previously informed Fipps-Hernandez of and informed her that it was for treatment the medical conditions she had requested accommodations for.

During this phone call, Fipps-Hernandez accused Plaintiff of having "poor work ethic" due to her use of sick leave and stated that Plaintiff should not use this leave time unless she "really needed it." *See Exhibit F7; Exhibit C4; Exhibit P; Exhibit R.* Plaintiff, again, disclosed that she was undergoing treatment for medical conditions related to her earlier medical accommodation request, and disclosed that she was also undergoing fertility treatments. *See Exhibit C7 (p. 81, lines 24-25, p. 82, line 1-25; p. 83, lines 1-25, p. 84, lines 1-3); Exhibit C4.* Still, Fipps-Hernandez continued to ridicule Plaintiff's use of sick leave, despite Plaintiff never using sick leave at a deficit. *See Exhibit F7; C7 (p. 87, lines 12-16).* At the time of this phone call, Plaintiff had over 31 hours of leave time available. *See Exhibit S1.* Fipps-Hernandez ended the call by instructing Plaintiff to go home and stating that she, Plaintiff, and Jones would be meeting next week regarding that phone call. *See Exhibit F7.* This meeting manifested as the May 12 meeting.

When considering these circumstances collectively, Defendant's conduct was extreme, deliberate, and calculated so as to create an intolerable work environment. This is further supported by Plaintiff's immediate attempt to report the behavior, her subsequent resignation, and the documentation she drafted shortly after that revealed her perceptions of Defendant's actions.

**5. Liability for the Harassment can be Imputed to the Employer**

When the harasser is the victim's supervisor, the employer is strictly liable for the supervisor's harassing behavior if it "culminates in a tangible employment action," but they otherwise "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015).

Both harassers in this case, Jones and Fipps-Hernandez, were Plaintiff's supervisors. *See Exhibit I1 (p. 2).* Moreover, the harassment led to Plaintiff's constructive discharge, which is a tangible employment action. As such, Defendant is strictly liable for the supervisors' harassing behavior. Defendant cannot escape liability for the harassment because the facts show that they did not exercise

20

reasonable care to prevent or correct the harassing behavior. Plaintiff called HR immediately after the May 12 meeting and was informed that she needed to file a complaint through the very individuals that harassed her. *See Exhibit P; Exhibit R; Exhibit N.* The HR rep then stated that the only thing Plaintiff could do was externally file an EEOC complaint. *See Exhibit P; Exhibit R.* Believing she was all out of options, Plaintiff resigned.

Plaintiff then received an exit survey from Tia Wilder ("Wilder"), Health Benefits Representative, and used that opportunity to report the events that took place on and leading up to the May 12 meeting. *See Exhibit P.* Plaintiff also sent a follow-up email stressing that these events were the only reason she resigned. *See Exhibit P.* Wilder did not respond to this email. Plaintiff then emailed Maxine Evans-Armwood, Director of Court Services, to report the events, as well as rescind her resignation to transfer to a different district instead. *See Exhibit R.* Evans-Armwood did not respond to this email. Plaintiff then received a phone call prior to her last working day at NCDPS from Miguel Pitts, Central Area Administrator. She reiterated to him the details she outlined in her email to Evans-Armwood and requested to transfer. *See Exhibit I7.* Pitts stated that transferring would not be possible and that Plaintiff's only recourse at this point was filing an external EEOC claim. *Id.*

Moreover, Defendant admits that they did not conduct a formal internal investigation, nor create a formal complaint, as required by their policy, on Plaintiff's behalf in response to any of Plaintiff's complaints neither before or after Plaintiff's last working day; only a statement from Jones and Fipps-Hernandez were required without any additional follow-up. *See Exhibit G7 (p. 78, lines 19-25, p. 79 lines 1-14).* As such, Defendant did not exercise reasonable care to prevent or correct the harassing behavior; despite any hostile work environment or workplace harassment policies they may have in place. These same facts show that Plaintiff did attempt to reasonably take advantage of the preventative and corrective opportunities available to her by contacting everyone she reasonably believed could help. However, she was ignored or given limited options at each turn by only being provided with the steps to obtain *external* redress; that of which she promptly sought by filing her EEOC complaint on June 2, 2022.

For the reasons outlined in this section, the court should rule as a matter of law that Plaintiff was subjected to a hostile work environment.

## F.  FMLA INTERFERENCE

To establish a claim of "interference" under the FMLA, an employee must demonstrate that 1) they are entitled to an FMLA benefit, 2) that the employer interfered with the provision of that benefit, and 3) that the interference caused harm. *Roberts v. Gestamp W. Virginia, LLC*, 45 F.4th 726, 732 (4th Cir. 2022).

### 1.  Plaintiff was Entitled to FMLA Benefits

For an employee to qualify for FMLA leave, they must have worked for the employer for at least 12 months and must have worked at least 1,250 hours of service during the previous 12-month period. 29 U.S.C. § 2611(2)(A)(i)-(ii). If the employer in question is a public agency, they are considered a covered employer under the FMLA regardless of its number of employees. § 2611(4)(A)(iii). The employee must also be seeking leave for a qualified reason, such as for a "serious health condition", which includes any physical impairment that involves continuing treatment by a healthcare provider. § 2612(D); §2611(11).

Plaintiff was an eligible employee under the FMLA, having been employed by Defendant for over a year and meeting the hour requirements stipulated by the Act. *See Exhibit K1*. Defendant qualifies as an employer under the FMLA since they are classified as a public agency. Plaintiff suffered from the medical conditions of Infertility, Dysmenorrhea, and Endometriosis, which required continued medical care during the relevant period. *See Exhibit C1; Exhibit D1; Exhibit A1; Exhibit E; Exhibit M3; Exhibit G*. These conditions establish that Plaintiff was entitled to FMLA protections.

### 2.  Defendant Interfered with Plaintiff's Access to FMLA Benefits

An employer's obligations under the FMLA are triggered by the employee's "adequate notice" of their need for FMLA leave. *Roberts v. Gestamp W. Virginia, LLC*, 45 F.4th 726, 732 (4th Cir. 2022). In providing this notice, the employee is not required to use "magic words," but must provide sufficient notice to the employer that allows them to determine whether the leave may qualify under FMLA and must do as soon as practicable if the need for leave is not foreseeable. *Id*; § 2612(e)(1). An employee's

22

disclosure of a potentially FMLA-qualifying circumstance and an inquiry into leave options is sufficient to support a finding that the employee triggered their employer's FMLA obligations. *Hannah P. v. Haines*, 577 F. Supp. 3d 429, 442 (E.D. Va. 2021), aff'd, 80 F.4th 236 (4th Cir. 2023). Once the employer's obligations are triggered, the employer is then expected to obtain any additional required information through informal means for the purposes of assisting the employee with accessing their FMLA benefits. *Gestamp*, 45 F.4th 726 at 732. The employer must also notify the employee of their eligibility to take FMLA leave within five business days. *Adkins v. CSX Transportation, Inc.,* 70 F.4th 785, 795 (4th Cir. 2023).

Plaintiff provided "adequate notice" of her need for leave through an email to Fipps-Hernandez on May 2, 2022. In this email, Plaintiff notified Fipps-Hernandez of an upcoming doctor's appointment related to the medical conditions discussed during their phone call on April 29. *See Exhibit W1*. Plaintiff then reminded Fipps-Hernandez of these medical conditions and her need to take leave to manage them for treatment through a phone call on May 6. *See Exhibit C7 (p. 77, lines 2-25, p. 78, lines 1-5), (p. 81, lines 24-25, p. 82, line 1-25; p. 83, lines 1-25, p. 84, lines 1-3); Exhibit C4*. Finally, Plaintiff informed both Jones and Fipps-Hernandez that she required leave time for treatment of her medical conditions during the May 12 meeting. *See Exhibit C7 (p. 152, lines 12-25, p. 153, lines 1-12); Exhibit G7 (p. 56, lines 11-25, p. 57, lines 1-7); Exhibit C4; Exhibit P; Exhibit X; Exhibit R, Exhibit H7.*

In each of these discussions, Defendant was made aware of 1) specific details of each of Plaintiff's medical conditions, 2) the severity of Plaintiff's medical conditions, and 3) the fact that she was receiving ongoing, active treatment for these medical conditions. 4) Plaintiff put Defendant on notice well in advance of the required leave as soon as it became practicable. For example, Plaintiff informed Fipps-Hernandez of her OBGYN appointment shortly after she scheduled it. *See Exhibit W1*. She also informed Fipps-Hernandez of her upcoming surgery almost 21 days in advance. *See Exhibit D7 (p. 2)*. For each of these disclosures, Plaintiff either informed that she was scheduled for surgery, taking "stronger medication", or was actively undergoing fertility treatment. In fact, Plaintiff provided Defendant with a doctor's note from the initial ER visit that led to her request for medical

23

accommodation and her need for leave for medical treatment. *See Exhibit B7.* As such, Plaintiff provided Defendant with sufficient information that should have allowed them to determine if the leave she sought qualified under the FMLA.

Despite these sufficient notices, Defendant failed to fulfill their obligations under the FMLA by failing to make Plaintiff aware of her rights to take leave under the FMLA and failing to initiate the formal process for requesting leave under the FMLA, as admitted by both Fipps-Hernandez and Jones. *See Exhibit G7 (p. 73, lines 8-26, p. 74, lines 1-3); Exhibit I (p. 2).* They also failed to fulfill their obligations by failing to seek additional information from Plaintiff regarding her medical conditions and her need for leave to treat them. Defendant actively discouraged Plaintiff from accessing her FMLA leave during the May 6 phone call when Fipps-Hernandez informed Plaintiff that her use of sick leave demonstrated "poor work ethic", that her leave usage was "excessive", and that she needed to save her sick leave for when she "really needed it." *See Exhibit F7; Exhibit C4; Exhibit P; Exhibit R.* Moreover, during the May 12 meeting, Jones flashed what he claimed was a history of Plaintiff's leave usage from her date of hire and told Plaintiff that she has used the most sick leave out of all other employees in the district. *See Exhibit C7 (p. 159, lines 13-25, p. 160, lines 1-12 and 24-25, p. 161, lines 1-25, p. 162, lines 1-24); Exhibit G7 (p. 83, lines 18-25, p. 84, lines 1-13).* Finally, Plaintiff was informed during this same meeting that she would not be staying with the Department at the end of her training progression and would be immediately terminated if this conversation were to ever occur again. *See Exhibit C7 (p. 159, lines 13-25, p. 160, lines 1-12 and 24-25, p. 161, lines 1-25, p. 162, lines 1-24); Exhibit G7 (p. 83, lines 18-25, p. 84, lines 1-13.*

Because any reasonable person would have felt discouraged from seeking leave under the FMLA after the occurrence of these events, these facts are sufficient to establish a claim of "FMLA interference".

**3. Plaintiff Experienced Harm from the Interference**

An employee must show that the FMLA interference prejudiced them. *McCormack v. Blue Ridge Behav. Healthcare*, 523 F. Supp. 3d 841, 855 (W.D. Va. 2021). Such prejudice can be proven by showing a loss of compensation, benefits, or employment status. *Id.*

The harm imposed upon Plaintiff by Defendant's FMLA interference is evidenced by the same facts outlined in sections E.4 and B.3 of this document, which are incorporated here by reference. Plaintiff's forced resignation, and her being required to take sick/vacation leave as opposed to FMLA leave, caused economic harm through lost wages and benefits. This is supported by Plaintiff's May 10 emails to Fipps-Hernandez. In these emails, Fipps-Hernandez instructed Plaintiff to submit leave requests for her OBGYN appointments and surgery, and that any further time would need to be taken from vacation leave without informing Plaintiff of her right to take leave under FMLA. *See Exhibit D7 (p. 1).*

For the reasons outlined in this section, the court should rule as a matter of law that Defendant interfered with Plaintiff's rights under the FMLA.

## G. FMLA RETALIATION

A claim of "retaliation" under the FMLA can be established by showing that 1) Plaintiff engaged in a protected activity, 2) their employer took an adverse employment action against them, and 3) there was a causal link between the two events. *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 245 (4th Cir. 2020).

### 1. Plaintiff Engaged in Protected Activity

Plaintiff engaged in protected activity under the FMLA by notifying Defendant of her need for leave for serious medical conditions that require ongoing treatment. This activity, as detailed in sections F.1 and F.2 of this document, includes Plaintiff's consistent communications to Defendant regarding her medical conditions and need for leave to attend related medical appointments and treatments. These facts are incorporated here by reference.

### 2. Plaintiff was Subjected to Adverse Employment Action

The facts from sections F.2 and F.3 of this document are incorporated here by reference. As addressed in these sections, Defendant took adverse employment action against Plaintiff in retaliation to

25

her protected FMLA activities by criticizing and discouraging her leave usage, failing to provide her with notice of her FMLA rights, failing to initiate the formal FMLA leave process, creating a hostile work environment through repeated beratement of her leave usage and the dismissal of her medical needs, threatening termination, and forcing her into a constructive discharge.

### 3. There was a Causal Link Between Protected Activity and the Adverse Employment Action

The facts from section F.3 of this document are incorporated here by reference. The causal link between Plaintiff's protected activity and Defendant's adverse actions is established by the temporal proximity between Plaintiff's FMLA-related disclosures and Defendant's retaliatory conduct. Defendant's immediate response to Plaintiff's leave requests included threatening comments, dismissal of her medical conditions, and failure to provide FMLA-mandated assistance, all of which occurred in direct, often immediate, response to Plaintiff's protected activity. Moreover, Plaintiff was compelled to put in her resignation on the same day of the May 12 meeting. These facts demonstrate the causal link between Plaintiff's protected activity and Defendant's adverse employment action.

For the reasons outlined in this section, the court should rule as a matter of law that Defendant retaliated against Plaintiff under the FMLA.

## H. SEX DISCRIMINATION

An employee is discriminated against 'because of' their gender if, 'but for' the employee's gender, they would not have been the victim of the discrimination. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011). Sex discrimination may be found when a female victim is discriminated against in such sex-specific terms as to make it clear that the discriminator is motivated by general hostility to the presence of women in the workplace. *Id.* Title VII prohibits sex-based discrimination even where the employee is not subjected to sexual advances or propositions. *Id.*

### 1. "But For" Sex Discrimination

Defendant's discriminatory treatment of Plaintiff, rooted in gender-based stereotypes, constitutes unlawful discrimination under Title VII. Fipps-Hernandez's discriminatory perception of Plaintiff's medical conditions and need for medical accommodations are revealed through the statements she made

26

during her deposition. Notably, when asked if she ever had menstrual pain that prevented her from working, Fipps-Hernandez stated that there were many occasions where she "did not feel like coming to work", yet she "worked through". *See Exhibit C7 (p. 71, lines 21-23, p. 72, lines 8-11).* This shows that Fipps-Hernandez trivialized Plaintiff's medical condition by equating Plaintiff's severe and debilitating symptoms of endometriosis to her own less severe experiences with menstrual discomfort. By doing so, Fipps-Hernandez relied on a gender-based stereotype that women's menstrual-related ailments are simply something to be endured, rather than acknowledging the unique severity of Plaintiff's condition.

Moreover, Fipps-Hernandez repeated 6 separate times in her official statement that Plaintiff never disclosed a disability to her, while in the same statement outlining that Plaintiff 1) had "heavy menstrual cycles" that 2) may require teleworking when active, and 3) was having difficulty becoming pregnant to the point where 4) she was required to undergo in vitro fertilization. *See Exhibit C4.* This demonstrates that despite expressly knowing the severity and abnormal nature of Plaintiff's reproductive health, Fipps-Hernandez still attributed it to something unworthy of consideration under the ADA or the FMLA. The reason for this inconsistency is revealed by Jones' rationale as to why he could not allow Plaintiff's medical accommodation request – which was that "all females have menstrual cycles." *See C7 (p. 152, lines 23-25, p. 153, lines 1-5); Exhibit J7; Exhibit C4; Exhibit I4 (p. 9).*

When asked what would have triggered an ADA from her, Fipps-Hernandez stated she would have needed "a little more" than the disclosure of "heavy periods" because "lots of females go through that." *See C7 (p. 170, lines 4-9 & 14-23).* Notwithstanding the fact that this interpretation of what Plaintiff disclosed regarding her medical condition is massively diminished compared to what was written in her official statement, this statement further demonstrates that her actions of ignoring and erroneously denying Plaintiff's medical accommodation request stemmed from discriminatory intent based on sex.

In expressing their reasons as to why they refused to accommodate Plaintiff, Defendant minimized Plaintiff's legitimate medical disorders as "normal" and something that "all women" are expected to endure. These statements were not rooted in an objective and individualized assessment of Plaintiff's condition, as required under the ADA, but rather in sex-specific assumptions that trivialized her

27

severe symptoms. Jones and Fipps-Hernandez repeatedly framed Plaintiff's request for accommodation in terms of "all females" and stated that granting her request would set a precedent for other women in the district. "But for" Plaintiff's gender and her gender-specific disability, she would not have been subjected to this dismissive treatment, as Defendant would not have logically been able to use an "all women" rationale for their blatant denial of Plaintiff's accommodation request.

The Fourth Circuit has acknowledged that general hostility to women in the workplace can form the basis of a Title VII claim. *Hoyle*, 650 F.3d at 331. Defendant's repeated insistence that accommodating Plaintiff would necessitate granting the same accommodations to "all females" reflects a belief that women's health-related needs are burdensome to the workplace. This attitude is indicative of a culture in which women are devalued and discouraged from seeking support for gender-specific medical conditions.

Plaintiff may also establish a case of "sex discrimination" under Title VII by a showing of 1) membership in a protected class, 2) satisfactory job performance, 3) adverse employment action, and 4) that similarly situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 295 (4th Cir.2004).

### 2. Plaintiff is a Member of a Protected Class

Plaintiff is a biological female, which establishes her membership in the protected class of "sex" under Title VII.

### 3. Plaintiff had Satisfactory Job Performance

Defendant admits that Plaintiff was performing her job satisfactorily during the relevant time period. *See Exhibit P7.*

### 4. Plaintiff was Subjected to Adverse Employment Action

Defendant subjected Plaintiff to adverse employment actions by refusing to consider her medical accommodation request and subsequently denying her the assistance and process required to officially consider this request. Defendant has expressly stated that their reasoning for doing so was based on the female-specific nature of Plaintiff's medical conditions. *See Exhibit J7; Exhibit C4.* This demonstrates

28

discriminatory intent on the basis of sex, and these actions stemming from this sex-based discrimination adversely affected Plaintiff's employment by negatively impacting her ability to manage her medical condition and creating an intolerable work environment that resulted in her constructive discharge.

**5. Similarly Situated Employees Outside of the Protected Class Received More Favorable Treatment**

Defendant treated similarly situated male employees more favorably. Plaintiff witnessed a male JCC, referred to as "J.C.", successfully receive guidance from Defendant to submit a formal medical accommodation. *See Exhibit K7.* J.C. affirmed this later via a phone call with Plaintiff on November 8, 2024, where he disclosed more specifically that he disclosed his disability to either Fipps-Hernandez, Jones, or both, prior to his last working day. *See Exhibit K7.* In response, they provided him the phone number for Wilder. J.C. subsequently called Wilder, who sent him a form to initiate the formal medical accommodation process. *See Exhibit K7.* J.C. also clarified that he only submitted medical documentation to Defendant **after** specifically being asked to, and that he did not put his initial request for accommodations in writing. *See Exhibit K7.* Finally, Jones admitted that the only material difference between a JCCT and JCC is the job title, qualifications required, and salary. Outside of these, they are functionally the same position, performing the same duties, under the same leadership, and are expected to receive the same treatment from for personnel matter such at medical accommodation requests. *See Exhibit G7 (p. 19, lines 20-24, p. 20, lines 1-13).*

The handling of J.C.'s accommodation request demonstrates a stark contrast to Plaintiff's, as Plaintiff's multiple requests for accommodations were ignored prior to being blatantly rejected without Defendant providing the same procedural guidance afforded to her male counterpart. *See Exhibit G7 (p. 73, lines 8-25, p. 74, lines 1-3; p. 75, lines 12-25, p. 76, lines 1-4); Exhibit C7 (p. 93, lines 13-24).*

The Defendant may argue that J.C. never received the medical accommodation because he resigned prior to Defendant reaching a conclusion on the request. Crucial here, however, is the fact that J.C. *still* received procedural guidance and was afforded the interactive process required under the ADA that Plaintiff was actively deprived of. Even more compelling for a finding of discriminatory intent is the

29

fact that Defendant assisted J.C. with his medical accommodation request well before Plaintiff requested hers, as evidenced by the fact that Plaintiff requested accommodation weeks after J.C. was no longer with NCDPS, precluding any argument of ignorance Defendant attempts to raise. *See Exhibit K7.*

## 6. Sex Discrimination Conclusion

Defendant did not engage in a good-faith, individualized assessment of Plaintiff's medical accommodation request. Instead, Defendant relied on stereotypical assumptions about women's health, dismissing Plaintiff's condition as "normal" and refusing to accommodate her based on the belief that other women would make similar requests. "But for" Plaintiff's gender, her request would not have been trivialized, and her condition would not have been dismissed in such a discriminatory manner.

Moreover, Plaintiff and J.C. sought medical accommodations in the exact same manner through the exact same managers. Yet, their pursuits in effectuating this protected activity were handled very differently. J.C. received complete and unimpeded assistance from Defendant in his pursuit for medical accommodations. Plaintiff was repeatedly ignored until Defendant outright denied her request without it ever being forwarded to the proper personnel officer. The only variable difference in these two situations is that Plaintiff sought medical accommodations for a female-specific medical condition. Between this glaring difference in treatment, as well as Jones' explicit statement that he "would have to do the same for every female in the office", it is clear that Defendant discriminated against Plaintiff by refusing her access to her employment rights under the ADA and FMLA on the basis of her sex and her sex-specific condition. Accordingly, the Court should rule that Defendant discriminated against Plaintiff on the basis of sex.

This 26th day of December 2024.

Christian Proffitt
1701 H St. NE
Unit 803
Washington, DC 20002
christian.proffitt62@outlook.com

30

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00306-M-RN

| | | |
|---|---|---|
| CHRISTIAN PROFFITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| NORTH CAROLINA DEPARTMENT OF | ) | |
| PUBLIC SAFETY, | ) | |
| | ) | |
| Defendant | ) | |

I hereby certify that on December 26, 2024, a copy of **PLAINTIFF'S MOTION FOR**

**PARTIAL SUMMARY JUDGMENT** was served upon the following person(s) by **EM/CF** as

follows:

Manuel C. Davis
N.C. Department of Justice
Public Safety Section
114 W. Edenton St.
Raleigh, North Carolina 27603
mdavis@ncdoj.gov
lcarcioppolo@ncdoj.gov

Orlando Luis Rodriguez
N.C. Department of Justice
Special Litigation Section
114 W. Edenton St.
Raleigh, North Carolina 27603
orodriguez@ncdoj.gov

This 26th day of December 2024.

Christian Proffitt
1701 H St. NE
Unit 803
Washington, DC 20002
christian.proffitt62@outlook.com