IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00306

| | |
|---|---|
| **Christian Proffitt**, | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **North Carolina Department of Public Safety**, | |
| Defendant. | |

Plaintiff Christian Proffitt claims that her former employer, Defendant North Carolina Department of Public Safety, violated her rights under the Americans with Disabilities Act, the Family and Medical Leave Act, and Title VII of the Civil Rights Act of 1964. Proffitt's claims stem from the way that NCDPS allegedly responded to her need for fertility treatments and her request to telework when she was suffering from painful menstrual cramps.

Both parties have asked the court to grant summary judgment on a portion of Proffitt's claims. But, for the most part, the existence of factual disputes precludes granting summary judgment for either party.

The only exception, however, is NCDPS's request for summary judgment on Proffitt's Title VII claim. Since she has failed to identify a valid comparator, NCDPS is entitled to a judgment as a matter of law on that claim. So the District Court should grant NCDPS's motion on that point and otherwise deny the parties' motions.

I.      **Background**

Proffitt's medical issues existed before her employment with NCDPS and persisted after she resigned. And, as discussed below, it does not appear that Proffitt shared the full extent of her

conditions with her employer. So this opinion begins by recounting Proffitt's medical issues before moving on to her employment with NCDPS and the initiation of this lawsuit.

### A. Proffitt's Medical Issues

For many years, Proffitt has suffered with painful menstrual cycles. Pl.'s Ex. A7, D.E. 64–1 (claiming she suffered from "debilitating period cramps since middle school"). According to Proffitt, the pain is so severe that she is confined to bed during the first day of her menstrual cycle. *Id.* Over the course of several years, Proffitt discussed her condition with friends over text messages and on various websites. Pl.'s Ex. X1 at 1–2, D.E. 64–5.

For more than a decade she managed this pain by taking 800 milligrams of ibuprofen. Pl.'s Ex. A7, D.E. 64–1. But in 2022, she had to stop taking this medication after being diagnosed with gastritis. *Id.* As an alternative, her medical provider prescribed oxycodone to alleviate her pain, Pl.'s Ex. D, D.E. 64–6, but told her that she could not take it while at work, Pl.'s Ex. D7, D.E. 64–8 at 2.

On April 26, 2022, Proffitt visited the ER for intermittent "epigastric and midabdominal pain." Pl.'s Ex. H, 64–15 at 1. At that time, she was diagnosed as suffering from constipation and gastritis. Pl.'s Decl. ¶ 5, 19; Ex. B7 at 1, D.E. 64–2; Ex. H, D.E. 64–14.

The following week, on May 4, 2022, Proffitt saw a doctor complaining of painful periods. Pl.'s. Ex. F, 64–11. She was assessed as having dysmenorrhea and prescribed Percocet. *Id.* Her provider also recommended that she undergo a hysteroscopy. *Id.*

Proffitt received a formal diagnosis of endometriosis in March 2024. Pl.'s Decl. ¶ 33; Ex. M3 at 1, D.E. 64–27; Ex. N3, D.E. 64–30.

Proffitt also struggled with infertility. For several years, apparently beginning in 2018, Proffitt and her husband were unsuccessful in their attempts to have children. Pl.'s Ex. A7. They sought medical care to address this issue. Pl.'s Ex. E, D.E. 64–9.

### B.    Proffitt's Employment with NCDPS

Proffitt began working for NCDPS in December 2020 as a Juvenile Court Counselor ("JCC") Trainee. Pl.'s Ex. KI, D.E. 64–22. JCCs are responsible for assessing and monitoring juveniles and their families, developing treatment plans, and ensuring compliance with court orders. Pl.'s Ex. M7 at 2, D.E. 64–28. The job involves, among other things, home visits, school visits, contact with service providers, and providing supervision and support to juveniles. *Id.* Trainees participate in a 12- to 24-month training program and, if successful, can advance to a permanent position. *Id.*

Proffitt began in a case management role but transitioned to intake work in November 2021. Bullard Dep. at 22:5–14, D.E. 70, Ex. 3. Intake work involves drafting complaints against juveniles and determining whether matters should proceed to court or be addressed through some other means. Jones Dep. at 29:2–10, D.E. 70. Ex. 2.

After her April 2022 visit to the emergency room, Proffitt missed "two or three" days of work. Fipps-Hernandez Dep. at 74:17–75:23. She provided her supervisor, Julie Fipps-Hernandez, with a doctor's note stating that she had been seen in the emergency room on April 26, 2022, but it did not specify the reason for her visit. Pl.'s Ex. B7, D.E. 64–2. The note excused Proffitt from work until April 29, 2022. *Id.* Fipps-Hernandez believed Proffitt sought care for stomach ulcers. Fipps-Hernandez Dep. at 75:1–6.

On or about May 6, 2022, Proffitt had a phone conversation with Fipps-Hernandez about two medical issues. To begin with, they discussed her heavy menstrual cycles and painful

menstrual cramps. Fipps-Hernandez Written Statement, D.E. 70 at 6; Fipps-Hernandez Dep. at 70:16–71:25 & 72:21–73:3. Proffitt told Fipps-Hernandez that "she may need to work from home during each month." Fipps-Hernandez Written Statement. Proffitt also shared that she was having difficulty getting pregnant and was undergoing in vitro fertilization. *Id*.; Fipps-Hernandez Dep. at 77:25–78:5. There was some discussion during the call about endometriosis, but the specifics of that discussion are unclear. Fipps-Hernandez Dep. at 128:1–20. Proffitt claims that Fipps-Hernandez said that she may be suffering from endometriosis. *Id.* But Fipps-Hernandez maintains that she was not diagnosing Proffitt and, instead, was sharing that she had a friend with endometriosis. *Id*.

Proffitt says that during this conversation, Fipps-Hernandez criticized the amount of time she was taking off. Pl.'s Ex. F7, D.E. 64–12. Fipps-Hernandez allegedly said Proffitt had taken "an excessive amount" of leave and that doing so "shows poor work ethic." *Id.*

Although she does not recall when it occurred, Fipps-Hernandez acknowledged that she spoke with Proffitt "on at least 2–3 occasions regarding her low balance of leave time." Fipps-Hernandez Written Statement; Fipps-Hernandez Dep. at 84:4–17. She claims that she did this out of concern that Proffitt would exhaust her paid leave, which would require her to take unpaid time off and "possibly cause a financial hardship" for Proffitt and her family. *Id.*

And at some point before that call, Proffitt asked for and received ibuprofen from Fipps-Hernandez. *Id.* at 73:9–21. Fipps-Hernandez does not recall why Proffitt needed the medication, *id.* at 73:23–74:1, but Proffitt claims it was to deal with her painful cramps, Pl.'s Statement of Undisputed Facts ¶ 52, D.E. 65

Then, on May 10, 2022, Proffitt emailed Fipps-Hernandez requesting time off to undergo a hysteroscopy. Pl.'s Ex. D7 at 2. She sought time off on June 1, 2022, for "a pre-op" appointment

as well as time off on June 6, 2022, for the procedure itself and any additional time necessary for recovery. *Id.*

In this email, Proffitt also shared that she had been given "stronger" medication "for the first day of [her] menstrual cycle," but she was told that she could not take the medication at work. *Id.* at 2. She hoped to start her menstrual cycle in the evening, but if she began during the workday she would "have to work something out." *Id*.

The next day, May 11, 2022, Fipps-Hernandez responded that Proffitt would need to use any accrued sick leave to cover her time away from work and if she was out of sick leave, she would need to use her vacation leave. *Id.* at 1.

On May 12, 2022, Proffitt met with Randy Jones, Court Counselor Chief, and Fipps-Hernandez. Fipps-Hernandez Written Statement. According to Fipps-Hernandez, the meeting's purpose was to discuss Proffitt's "poor work performance," but before the meeting Fipps-Hernandez had informed Jones that Proffitt "had requested to telework during [her] menstrual period." Fipps-Hernandez Dep. at 151:25–152:1; Jones Dep. at 62:25–63:15.

During the meeting, Proffitt "mentioned that she may need to work from home during her menstrual cycle." *Id.* During the COVID-19 pandemic, JCCs performing intake duties were allowed to telework. Fipps-Hernandez Dep. at 57:9–15, D.E. 70, Ex. 4. During this period, JCCs would maintain contact with juveniles, their families, service providers, and others over the phone. *Id.* at 58:17–59:9. The record does not reflect when the telework policy ended.

Jones rejected Proffitt's request, stating that he did not "think that was an option. . .because if [he] afforded [Proffitt]" the opportunity to telework, he would need "to afford every female in [his] office that same right[.]" Jones Dep. at 61:22–62:5. *Accord* Fipps-Hernandez Dep. at 152:18–153:3.

The meeting also featured a discussion about Proffitt's future with NCDPS, but it is unclear what was said. Proffitt maintains that Jones told her that she would not be promoted and, instead, would be terminated at the end of her training period. Pl.'s Statement of Undisputed Facts ¶ 33(e). Fipps-Hernandez recalled that Jones said that due to deficiencies in Proffitt's work, he had "concern[s] that [she] was not working up to par for him to recommend [Proffitt] for a court counselor position." Fipps-Hernandez Dep. at 153:4–10. Jones, however, claims that he said that he "would consult with [his] superiors about the process at the end of two years if a trainee is not recommended to be hired as a court counselor." Jones Dep. at 68:5–10. Jones acknowledged discussing this topic with his supervisor at least two times during Proffitt's tenure. Jones Written Statement, D.E. 70 at 8.

That same day, Proffitt submitted her resignation, effective May 19, 2022. Pl.'s Ex. E7, D.E. 64–10. Before her resignation became effective, Proffitt asked about the potential for being transferred to another unit. Pl.'s Ex. R, D.E. 64–38. Apparently, nothing came of this request.

## C.    Lawsuit

After Proffitt resigned, she filed a Charge of Discrimination with the EEOC. That agency eventually issued a Notice of Right to Sue Letter to Proffitt and she commenced her action in this court against NCDPS.

She filed suit in this court in August 2023. Her most recent complaint brings claims under the Americans with Disabilities Act alleging a failure to accommodate, disability discrimination, retaliation, and the existence of a hostile work environment. Proffitt is also pursuing claims under the Family and Medical Leave Act for interference with her FMLA rights, discrimination, and retaliation. Finally, she is pursuing a claim under Title VII of the Civil Rights Act of 1964 for sex-based discrimination.

6

Her Title VII claim is based on a conversation she had in November 2024, with a male former employee of NCDPS with the initials J.C. Proffitt Aff. ¶ 1, D.E. 64–23. According to Proffitt, J.C. claimed that while he worked for NCDPS he told Fipps-Hernandez and Jones that he had a medical disability. *Id.* ¶ 3. After learning of J.C.'s disability, Fipps-Hernandez and Jones allegedly provided him "with the contact information for [a] Health Benefits Representative. . .so that he could initiate a formal medical accommodation request." *Id.* ¶ 4. The representative sent J.C. "a form to complete and submit for his medical accommodation request." *Id.* ¶ 5. But J.C. resigned from NCDPS before his request was addressed. *Id.* ¶ 7.

After engaging in discovery, both parties filed motions for summary judgment. Proffitt seeks summary judgment on all her ADA and Title VII claims, as well as her FMLA interference and retaliation claims. NCDPS seeks summary judgment on her ADA and Title VII claims. After the parties completed their briefing, the court heard argument on the cross-motions for summary judgment.

## II. Discussion

This case presents a series of interrelated claims under the ADA, the FMLA, and Title VII of the Civil Rights Act. Each claim relates to how NCDPS responded to Proffitt's need for fertility treatments, complaints of severe pain during her menstrual period, and her request for an accommodation. Other than Proffitt's Title VII claim, there are genuine issues of material fact that preclude summary judgment for either party. But because she failed to present sufficient evidence that a similarly situated male employee received better treatment than she did, NCDPS is entitled to summary judgment on her Title VII claim.

7

A.      **Summary Judgment Standard**

Summary judgment is appropriate when the pleadings, affidavits, and other discovery materials before the court show that "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Tolan* v. *Cotton*, 5472 U.S. 650, 656–57 (2014). In making this determination, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *News & Observer Publ'g Co.* v. *Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (quoting *Hunt* v. *Cromartie*, 526 U.S. 541, 552 (1999)).

The movant initially carries the burden of showing that no genuine issue of material fact exists. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 324 (1986). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant discharges this burden by identifying "an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

The non-movant must then identify specific facts showing there is a genuine issue for trial. *Id.* at 323. To meet this burden, the non-movant must present "more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects* v. *Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Dash* v. *Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)) (internal quotation marks omitted). The court must assess, "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Gordon* v. *Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Anderson*, 477 U.S. at

8

251–52). If the non-movant fails to meet his burden, summary judgment must be granted. *Celotex*, 477 U.S. at 322.

When, as here, the court is confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol* v. *Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation omitted). In conducting this analysis, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (quotation omitted).

With this standard in mind, the court turns to the parties' summary judgment motions.

## B.    ADA Failure to Accommodate Claim

Proffitt claims that NCDPS violated her rights under the ADA when it failed to provide reasonable accommodations for her painful menstrual cycles.[1] Both parties seek summary judgment on this claim. Proffitt claims that the undisputed evidence entitles her to a judgment in her favor. But NCDPS argues that it is entitled to summary judgment because she has not established that she lives with a disability.

The ADA requires that an employer "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . .unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" 42 U.S.C. § 12112(b)(5)(A). A plaintiff claiming that her employer violated this provision must establish four things to establish a prima facie case. First, she must show that she has a disability as that term is defined under the ADA. *Wilson* v. *Dollar Gen. Corp.*,

---

[1] In her briefing, Proffitt also argued that her infertility entitled her to ADA protections. But at the hearing on the parties' motions, she clarified that her infertility is relevant only to her FMLA claims. Hr;g Tr. at 14:20-16:7, D.E. 88.

717 F.3d 337, 345 (4th Cir. 2013). Second, she must prove that her employer had notice of her disability. *Id.* Third, she must demonstrate that she could perform the essential functions of her position with reasonable accommodations. *Id.* And fourth, she must satisfy the finder of fact that her employer refused to make those accommodations. *Id.*

### 1.    Disability

The parties dispute whether Proffitt has established, for summary judgment purposes, that she has an ADA-qualifying disability. Proffitt maintains that her painful menstrual cycles qualify as disabilities under the ADA. NCDPS argues that she has not put forward enough competent evidence[2] on this point to be entitled to summary judgment or to take her claims to trial.

Under the ADA, there are three ways a person can establish that she is disabled. To begin with, she can show that she lives with "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Or she can demonstrate that she has "a record of such an impairment[.]" *Id.* § 12102(1)(B). She can also do so by establishing that the defendant regarded her as having such an impairment. *Id.* § 12102(1)(C). In assessing whether a plaintiff is disabled, the court must construe this term "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A).

Proffitt claims that she has satisfied both the actual disability test and the regarded as test. Whether she has done so is a question of law for the court to resolve. *Hooven–Lewis* v. *Caldera,* 249 F.3d 259, 268 (4th Cir. 2001).

---

[2] NCDPS's brief appears to argue that the court should not consider Proffitt's evidence because it was not submitted in an admissible format.  At the hearing, NCDPS's counsel said that it was only challenging the sufficiency of her evidence, not whether the court could consider it. Hr'g Tr. at 7:19–9:2.

10

### a) Actual Disability

The court first turns to whether Proffitt's painful menstrual cycles qualify as an actual disability under the ADA, meaning that she lives with an impairment that substantially limits one or more of her major life activities. The ADA defines major life activities in two ways. One definition includes everyday tasks like sleeping, walking, standing, bending, working, and performing other manual tasks. 42 U.S.C. § 12102(2)(A). And the other definition involves the operation of major bodily functions, including reproductive functions. *Id.* § 12102(2)(B).

Once a court has identified the major life activity at issue, it must determine whether a plaintiff is substantially limited in her performance of that activity. To do so, the court must evaluate the plaintiff's ability to perform that activity "as compared to people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). And the "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* This evaluation requires an "individualized assessment," and "usually will not require scientific, medical, or statistical analysis." *Id.* § 1630.2(j)(1)(iv) & (v).

The Fourth Circuit has not determined whether endometriosis qualifies as a disability under the ADA, and federal courts are divided on the issue. *Compare Kampmier* v. *Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007) ("Although endometriosis is undoubtedly painful, in this case it does not rise to the level of disability under the ADA."), *with Bragdon* v. *Abbott*, 524 U.S. 624, 660 (1998) (Rehnquist, C.J., concurring in part and dissenting in part) ("There are numerous disorders of the reproductive system, such as dysmenorrhea and endometriosis, which are so painful that they limit a woman's ability to engage in major life activities such as walking and working.") & *Green* v. *Woodhaven Country Club, Inc.*, No. 3:13-CV-00318, 2013 WL 6800638, at *4 (W.D. Ky. Dec. 20, 2013) (finding plaintiff stated an ADA claim based on allegations of "debilitating" endometriosis).

11

Generally, whether a court finds conditions like Proffitt's to be a disability turns on how severely it impacts each plaintiff. So the court will consider the evidence Proffitt submitted on this point.

As part of her summary judgment filings, Proffitt relied on several types of documents to support the impact and severity of her condition. She submitted two posts from websites in which she discussed her condition and its effect on her. In one post from September 2020, she recounts how she had to miss class in college because she did not have pain medication to deal with "extremely bad cramps." Pl.'s Ex. C1, D.E. 64–3. That same exhibit recounts how her pain would cause her to "vomit and lay . . . paralyzed in bed for a whole day[.]" *Id.* And in May 2022 she posted on another website about her "debilitating period cramps" she has had "since middle school." Pl.'s Ex. A7, D.E. 64–1. She claimed that she could not "make it through the first day [of her period] without laying in bed immobile, only to vomit and poop hours later at the same time[.]" *Id.*

Proffitt also relies on notes from various doctor's visits. In May 2022, she saw her doctor seeking help with "painful periods" that caused vomiting and made her miss work. Pl.'s Ex. F, D.E. 64–11. Several months later, in November 2022, she saw a gynecologist to try to address this issue. Pl.'s Ex. D, D.E. 64–6. Also included is a record of visits with her gynecologist from July 2020 to May 2022, which list various diagnoses for, among other things, dysmenorrhea and abnormal vaginal bleeding. Pl.'s Ex. E, D.E. 64–9.

Another exhibit is a printout of a text exchange with her friends. In that conversation she discusses her "terrible period cramps" that are so severe that she "can't function" and cause her to vomit. Pl.'s Ex. D1, D.E. 64–7.

NCDPS has presented no evidence challenging the veracity of Proffitt's claims about the severity of her condition.

So Proffitt has submitted documents establishing the timing, frequency, and duration of her impairment. She has shown that for several years she suffered from severe menstrual-cycle-related pain that, for at least one day a month, confines her to bed and causes her to vomit and have diarrhea. Being bedridden impedes her ability to engage in any number of major life activities. And given that most members of the public are not confined to their beds for one day a month, Proffitt is substantially limited in her ability to engage in those activities. Given that Congress requires the court to construe the terms disability and substantially limited broadly, 42 U.S.C. § 12102(4)(A) & (B), Proffitt has established that her endometriosis qualifies as a disability under the ADA. *Contra Munoz* v. *Selig Enters.*, 981 F.3d 1265 (11th Cir. 2020) (finding a plaintiff did not establish an ADA disability since the record lacked evidence of timing, frequency, and duration of her impairments)

### b)      Regarded as Having an Impairment

In her summary judgment motion, Proffitt also contends that NCDPS regarded her as disabled and took adverse action on that basis. Mem. in Supp. at 3. The ADA's "regarded as" prong applies where the employer acts based on a perceived impairment, whether or not that impairment actually limits a major life activity. 42 U.S.C. § 12102(3)(A).

But Proffitt did not allege that NCDPS regarded her as disabled in her Second Amended Complaint. Instead, she only alleged a disability based on her conditions substantially limiting her major life activities.[3] Second Am. Compl. at 7 § I(A), D.E. 36. Proffitt may not amend her pleading by adding new allegations in her summary judgment filings. *See Wahi* v. *Charleston Area Med.*

---

[3] Proffitt acknowledged this shortcoming at the hearing. Hr'g Tr. at 20:16–21:2.

*Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."). Thus there is no basis to consider whether Proffitt may maintain an ADA claim based on the allegation that NCDPS regarded her as being disabled.

### 2. Employer's Notice of Disability

Proffitt must also demonstrate that NCDPS was on notice of her disabilities. To do so, she need only "inform[] the employer of both the disability and the employee's need for the accommodations for that disability." *Rock* v. *McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *EEOC* v. *Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008)). This burden is "not a great one." *Id.* But "vague or conclusory statements revealing an unspecified incapacity are not sufficient" to meet it. *Rock*, 819 F. Supp. 2d at 473 (quoting *Huppenbauer* v. *May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *6 (4th Cir. Oct. 23, 1996) (unpublished)).

After taking all inferences in NCDPS's favor, the record does not establish that Proffitt adequately notified her employer about her menstrual-cycle-related disability. Proffitt informed her supervisors that she suffered from pain during her menstrual cycle. Jones Dep. at 56:25–57:6; Hernandez Dep. 70:16–71:1, 70:16–71:1, 72:21–73:11; May 10, 2022 Email from Proffitt to Hernandez (discussing medication and an upcoming medical appointment to address pain during her menstrual cycle). But there is no indication in the record that Proffitt disclosed that this pain resulted in substantial limitations in her ability to engage in major life activities. At no point, at least on the current record, did she notify her employer that the pain forced her to remain in bed, caused her to vomit and have diarrhea, or impacted her ability to sleep, walk, stand, bend, or perform most manual tasks.

14

The record here is similar to the record in *Lashley* v. *Spartanburg Methodist College*, 66 F.4th 168, 179 (4th Cir. 2023). In *Lashley*, the plaintiff claimed that during a meeting she told her employer that she "suffered from Lupus, asthma, post-traumatic stress disorder, and severe gastrointestinal issues." *Id.* at 171. Yet there was no evidence that she alerted her employer to "how these medical issues were significantly impairing her life activities." *Id.* at 179. The appellate court concluded that the plaintiff could not maintain a failure-to-accommodate claim because she had not adequately put her employer on notice of her disability. *Id.*

*Schneider* v. *Giant of Maryland, LLC*, 389 F. App'x 263 (4th Cir. 2010), is another case with analogous facts. In *Schneider*, the plaintiff claimed that his employer failed to provide reasonable accommodations to address the impact of his diabetes. *Id.* at 270. While the plaintiff's employer may have been aware he had diabetes, there was no evidence that the plaintiff ever "directly mentioned that he was suffering from acute impairments, i.e., hypoglycemic episodes, caused by his diabetic condition[.]" *Id.* Since it lacked that information, the employer could "not be held responsible for *guessing* that the diabetes had progressed to a point where [the plaintiff] was a disabled person under the ADA." *Id.*

*Lashley* and *Schneider* compel the conclusion that, when taking all inferences in NCDPS's favor, a reasonable jury could find that Proffitt did not adequately notify NCDPS that she was disabled. While she disclosed that she suffered pain during her menstrual cycle, she did not adequately disclose the impact that the pain had on her. As a result, she is not entitled to summary judgment on her failure to accommodate claim.

## C.    ADA Disability Discrimination Claim

Proffitt also contends that she is entitled to summary judgment on her ADA-based discrimination claim. She claims that the undisputed evidence shows that she lived with a

15

disability, was a qualified individual for her position, and that NCDPS took adverse employment action against her. NCDPS does not explicitly address her arguments beyond its saying that Proffitt has not shown she has an ADA-qualifying disability.

The ADA makes it illegal for a "covered entity" to "discriminate against a qualified individual on the basis of disability" in several job-related areas, including "discharge of employee . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on an ADA discrimination claim, a plaintiff must establish three things. First, "that she has a disability[.]" *EEOC* v. *Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000). Second "that she is a 'qualified individual' for the employment in question[.]" *Id.* And third, "that [her employer] discharged her (or took other adverse employment action) because of her disability." *Id.* A plaintiff may prove that she was the victim of discrimination "through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs* v. *N.C. Admin. Off. of the Cts.*, 780 F.3d at 572 (citing *Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 49–50 & n.3 (2003)).

The court begins its analysis with the final element, whether NCDPS took adverse employment action against Proffitt because of her disability. Proffitt alleges that NCDPS took adverse employment action against her when, at a May 2022 meeting, Jones told her that she would not be promoted at the end of her training program. Proffitt Mem. in Supp. at 11. And she says the "temporal proximity between" her "accommodation request and the decision to deny her promotion" establish that the adverse employment action was "directly tied to her request for medical accommodation." *Id*.

But the record is far from clear about whether Jones told Proffitt that she would not be promoted at the end of her training period. No doubt the record reflects that Jones engaged in

discussions with others on that topic, but nothing suggests that any final decision had been made. And it is also unclear what Jones said to Proffitt during the May 2022 meeting. So a jury could resolve this question in favor of either party. Thus, Proffitt is not entitled to summary judgment on this claim.

### D.    ADA Wrongful Discharge Claim

Proffitt also claims that NCDPS the violated the ADA when it constructively discharged her. "The ADA prohibits wrongful discharge as a form of disability discrimination." *Kelly* v. *Town of Abingdon*, 90 F.4th 158, 169 (4th Cir. 2024). A plaintiff asserting a wrongful discharge claim must show four things. First, that she "was a qualified individual with a disability[.]" *Id.* (quoting *Reynolds* v. *Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012)). Second, that she "was discharged[.]" *Id.* Third, that she "was fulfilling [her] employer's legitimate expectations at the time of discharge." *Id.* And fourth, that "the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination. *Id.*

The Fourth Circuit has explained that "[a]n employee is 'constructively discharged' if he resigns after his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Id.* at 169 n.7 (quoting *Green* v. *Brennan*, 578 U.S. 547, 555 (2016)). According to Proffitt, NCDPS's failure to accommodate her and its decision to not promote her were sufficient to satisfy this standard. Proffitt Mem. in Supp. at 16.

As noted above, the record is unclear both about what took place at the May 2022 meeting with Jones and whether a decision had been made to not promote her. Thus, she is not entitled to summary judgment on his claim.

17

### E.     ADA Hostile Work Environment Claim

Proffitt's final ADA-related claim alleges that she was subjected to a hostile work environment. This claim has five elements. First, she must show that she is "a qualified individual with a disability" under the ADA. *Fox* v. *Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). Second that she "was subjected to unwelcome harassment" in the workplace. *Id.* Third, that the harassment she faced was "based on" her disability. *Id.* Fourth, that "harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment[.]" *Id.* And fifth, that "some factual basis exists to" hold NCDPS liable for the conduct of its employees. *Id.*

This opinion's analysis begins with the "severe or pervasive" prong, as it is dispositive. A plaintiff's evidence on this issue "must demonstrate not only that [s]he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Id.* at 178. In assessing whether a workplace is objectively hostile a court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Walton* v. *Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)). The Fourth Circuit has explained "that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test" and "must show that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *EEOC* v. *Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (quoting *EEOC* v. *Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) & *Jennings* v. *Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).

Proffitt has not established, for summary judgment purposes, that the challenges she faced were severe enough to create a hostile work environment. She attempts to do so by noting that her supervisors would not grant her request to work from home, said they would not promote her, and

criticized the time she took off from work. Proffitt Mem. in Supp. at 19–20. This opinion has concluded that the record is unclear on the failure to promote issue, and the remaining allegations cannot satisfy this element. *See Manning* v. *N.C. State Univ.*, 724 F. Supp. 3d 438, 459 (E.D.N.C. 2024) ("[M]ere rude or insensitive treatment cannot sustain a hostile work environment claim."). Thus, she is not entitled to summary judgment on this claim.

### F.     Family and Medical Leave Act

Proffitt also seeks summary judgment on two of her three FMLA claims. She seeks a judgment in her favor on her claims that NCDPS interfered with her leave rights and retaliated against her for trying to use them. But there are factual disputes about these claims that preclude the court from granting her motions.

#### 1.     FMLA Interference

Proffitt first claims that NCDPS interfered with her FMLA rights by failing to inform her of her eligibility, provide the required paperwork, or guide her through the leave process after she provided actual notice of her need for medical leave. Pl.'s Mem. in Supp. at 23. Proffitt points to her emails, phone calls, conversations, and Fipps-Hernadez's and Jones's remarks. *Id.* In response, NCDPS argues that Proffitt has not established that she suffered harm from any alleged interference. NCDPS Mem. in Supp. at 17.

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under that law. 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, a plaintiff must show three things. First, that they were entitled to an FMLA benefit. *Ferretti* v. *Truist Fin. Corp.*, No. 3:23-CV-352-MOC-SCR, 2024 WL 5248158, at *2 (W.D.N.C. Dec. 30, 2024) (citing *Adams* v. *Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015)). Second, that their employer interfered with that benefit. *Id.*

And finally, that the interference caused them harm. *Id.* Once an employer learns that an employee's absence may qualify for FMLA leave, it must provide notice of eligibility within five business days and explain the process for applying. 29 C.F.R. § 825.300(b)(1); *see Owens* v. *Northwood Ravin, LLC*, No. 3:21-CV-00373-FDW-DCK, 2022 WL 17970211, at *5 (W.D.N.C. Dec. 27, 2022). Failing to do so may constitute actionable interference. *Adkins* v. *CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023).

NCDPS claims that Proffitt is not entitled to summary judgment because there is a factual dispute over whether she would be recommended for promotion and that she has not established that she suffered harm because of any interference. As previously noted, the court agrees with NCDPS that there is an issue of fact on the failure-to-promote issue.

On the harm issue, Proffitt claims that since NCDPS did not inform her of her FMLA rights, she used her employer-provided leave time to deal with her disabilities instead of FMLA leave. Proffitt Mem. in Supp. at 25. But NCDPS has shown that even if it has properly notified Proffitt of her FMLA rights, she still would have had to exhaust the leave it provided her before relying on FMLA leave. Johnson Dec'l ¶¶ 6 & 7, D.E. 70 at 407. The FMLA allows NCDPS to do so. 29 U.S.C. § 2612(d)(2)(A) ("[A]n employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided"). So Proffitt has not established harm stemming from NCDPS's alleged interference, and is not entitled to summary judgment on this claim.

### 2. FMLA Retaliation

Proffitt next seeks summary judgment on her claim that NCDPS retaliated against her for seeking FMLA leave. Mem. in Supp. at 25–26. She contends that after raising the possibility of leave, she was subjected to increased scrutiny, denied accommodations, and placed under

mounting pressure that culminated in her resignation. *Id.* She also points to the short time frame from which she requested accommodations, and she then resigned. Mem. in Supp. at 26. NCDPS does not address this argument in its response.

"The FMLA prohibits employers from discriminating against an employee for exercising [their] FMLA rights." *Hannah P.* v. *Coats*, 916 F.3d 327, 347 (4th Cir. 2019). At the summary judgment stage, courts analyze FMLA retaliation claims under the *McDonnell Douglas* burden shifting framework. *Nichols* v. *Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). So the plaintiff must make a prima facie case showing "that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to [her] protected activity." *Cline* v. *Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). If a plaintiff makes that showing, the defendant must then offer a non-discriminatory explanation for its actions. *Nichols*, 251 F.3d at 502. And if it does so, the plaintiff must then show "that the employer's proffered explanation is pretext for FMLA retaliation." *Id.*

The Fourth Circuit has explained that an "adverse employment action is a discriminatory act that adversely 'affects the terms, conditions, or benefits of the plaintiff's employment.'" *Giles* v. *Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (quoting *Holland* v. *Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)). The employer's conduct must rise to such a level that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from'" exercising their FMLA rights. *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (quoting *Rochon* v. *Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation omitted)).

Proffitt has not shown that NCDPS's alleged actions were materially adverse. As the court has noted, there is a genuine issue of material fact about her constructive discharge claim, and

there is no evidence in the record supporting her claim that her supervisors threatened to fire her if she raised the leave issue again. And her claim that her supervisors criticized her for taking leave does not rise to the level of adverse employment action. *See Hinton* v. *Va. Union Univ.*, 185 F. Supp. 3d 807, 831–33 (E.D. Va. 2016) (citing Fourth Circuit cases holding that "a reprimand without collateral consequences is so marginally adverse that it qualifies as neither 'materially adverse' nor [an] 'adverse employment action.'"). And the remaining allegedly materially adverse actions simply repackage her other ADA and FMLA claims. The existence of genuine issues of material fact about those claims prevents Proffitt from relying on them as a basis for summary judgment.

Since Proffitt has not established, at this phase of the case, that NCDPS took adverse employment actions against her, she is not entitled to summary judgment on her FMLA retaliation claim.

**G.     Title VII Sex Discrimination Claim**

Both parties seek summary judgment on Proffitt's Title VII sex discrimination claim. Proffitt claims that NCDPS's actions were based on her gender and that a similarly situated male coworker received better treatment than she did. NCDPS counters that Proffitt has failed to establish that a similarly situated employee outside of her protected class was treated differently than she was.

NCDPS's argument is persuasive. Proffitt has failed to provide enough evidence that a jury could conclude that her coworker was similarly situated to her and received preferential treatment. Thus, the District Court should grant NCDPS's motion on this issue.

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C.A. §

2000e–2(a)(1). Absent direct evidence, to establish a prima facie case of sex discrimination under

Title VII, a Proffitt must show four things. *Coleman* v. *Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th

Cir. 2010). First, that she is a member of a protected class. *Id.* Second, that she was performing

her job satisfactorily. *Id.* Third, that she suffered an adverse employment action. *Id.* And fourth,

that similarly situated employees outside her protected class were treated more favorably. *Id.*

      Here, Proffitt has not provided sufficient evidence that a similarly situated employee

received better treatment than she did. A plaintiff attempting to satisfy this element must "show

that they are similar in all relevant respects to their comparator." *Haywood* v. *Locke*, 387 F. App'x

355, 359 (4th Cir. 2010). A valid comparator must have "dealt with the same supervisor, . . . been

subject to the same standards and . . . engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of them

for it." *Mitchell* v. *Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see Haynes* v. *Waste

Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Yet "a comparison between similar

employees will never involve precisely the same set. . .of circumstances." *Haynes*, 922 F.3d at

223.

      Proffitt points to a male former coworker with the initials J.C. as a comparator. She says

that J.C. "verbally and informally disclosed his medical disability" to either Fipps-Hernandez or

Jones while working with NCDPS. Proffitt Dec'l ¶ 3, D.E 64–23. According to J.C., whoever he

spoke with "provided him with the contact information for" a human resources staff member "so

that he could initiate a formal medical accommodation request." *Id.* ¶ 4. That staff member then

sent J.C. "a form to complete and submit for his medical accommodation request." *Id.* ¶ 5.

There are at least two material differences that preclude J.C. from being a valid comparator for Proffitt.

First, Proffitt claims that J.C. notified a supervisor about a medical disability, yet she provides no information about the nature of that disability or what he told his employer about that condition. As noted above, whether Proffitt's condition qualifies as a disability depends on the severity of her symptoms. There is no indication whether J.C.'s condition required a similar fact-specific inquiry before it could be considered a disability. And there is a similar lack of evidence about what he told his supervisor about how his condition impacted his day-to-day ability to work.

Second, the record lacks any information about the nature of the accommodation J.C. pursued. He could, perhaps, serve as a valid comparator if he too sought to telework for one or more days a month. But since Proffitt has failed to address this point, there is no way for the court to assess whether she sought the same type of accommodation as J.C.

These shortcomings preclude Proffitt from establishing that she and J.C. "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Thus, J.C. is not a valid comparator and Proffitt has failed to present sufficient evidence so that a jury could find in her favor. NCDPS is entitled to summary judgment on this claim.

### III.    Conclusion

For all these reasons, the undersigned recommends the District Court deny Proffitt's motion for partial summary judgment (D.E. 62), grant NCDPS's motion with respect to Proffitt's sex discrimination claim, and otherwise deny NCDPS's motion (D.E. 67).

24

Additionally, after consulting with the presiding District Judge, the parties are ordered to participate in a court-hosted settlement conference. The Clerk of Court shall refer this matter to a United States Magistrate Judge to conduct the conference at a mutually convenient time.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: July 18, 2025

Robert T. Numbers, II
United States Magistrate Judge